City of Austin, Mr. Simon. May it please the Court, my name is Cal Simon. I represent Derrick Dillard, the appellant in this case. The errors in the District Court's grant of summary judgment here revolve around a central question, which is what is the employer's obligation under the Americans with Disabilities Act when it learns that an attempt that it made to accommodate an employee is unsuccessful and the employee asks the employer to reconsider different accommodations for him. The first error that the District Court made in this case was to find that past attempts at accommodating the employee obviated the need to consider any present or future requests by the employee for accommodation. What the court said here was that in this case the employee had been injured on the job given a extended period of leave way past his Family Medical Leave Act leave and then a year later was given an alternative assignment and the District Court found here that because the employer granted Mr. Dillard an additional period of leave past what it was obligated to do under the Family and Medical Leave Act, it satisfied its obligations under the ADA and had no further obligation to accommodate Mr. Dillard when Mr. Dillard asked for an alternative assignment more than a year later. Let me ask you to categorize some of these time periods for me. When would you say the accommodation by the city began? I think the accommodation by the city began in May of 20, well they accommodated him. You're going to say May. It did not begin until he started that position? They accommodated him in several different ways. The first accommodation was when his Family and Medical Leave Act leave ended and they didn't just fire him right then, they gave him an additional period of leave. Then they accommodated him in May of 2012 by offering him an alternative assignment as an administrative assistant. When would you say the interactive process began? I think that's a difficult question to answer because I'm not sure that I think they ever really engaged in an interactive process with him. I think that it could be said to have begun when he was released to return to work and they offered him the position of administrative assistant. What does the case law say or the regulations, which I don't think say that, the person is placed in some job? Doesn't it actually begin before that or can? You're just saying factually it didn't begin here? That's correct. The interactive process is supposed to begin when the employee says, I need an accommodation. And then the employer and the employer is supposed to sit down, talk about what accommodations might be appropriate, what the employees medical needs are. In this case the city didn't really do that with Mr. Dillard. According to Mr. Dillard's administrative assistant, he said, well, I don't know if I can really do that job, but since that's what you're offering me, I'm going to give it a try. So that's where the interact, that's I think the extent of the interactive process with him up until the time when he asked for a reassignment out of the administrative assistant position because he said it was not working out and his supervisor agreed that that was not an appropriate assignment for him. Now remind me, how soon did he ask for a different position? It was maybe several weeks into the assignment. I think it was very obvious from the get-go that that was not an appropriate position for him. The supervisor, Valerie Dickens, didn't want him in the job in the first place. She felt forced into it. That was her deposition testimony. And then when Mr. Dillard got into the job, she didn't give him any work to do. But were any of those problems with that position related to his disability? I mean, it seems to me he wasn't showing up. He was on time. He was playing video games at work. He wasn't going to training that might have made him better at that position. Was there a disability-based reason he wasn't performing in that job? The only reason that he wasn't performing in the job was because he wasn't given any work to do. I mean, that's his testimony. Now, Ms. Dickens says that she did give him an assignment, but the only thing that he says she did was she gave him a stack of papers to go through and make a spreadsheet out of. Well, do you have any evidence that that failure to give him enough work was related to his disability? I don't think it was related to his disability. I think it was related to the fact that he was not suited to that job. Ms. Dickens didn't think he was suited to the job, and he just didn't have the qualifications for it. Isn't that why you go to training? I think that there's some possibility, yes. That's why you can go to training for a job. But this is a guy who's been doing road maintenance for the city of Austin for the last 15 years, and then they stick him in a job as a secretary for which he has no training, no experience. The person that replaced him in that job was a woman who had served as a secretary for 25 years. That's the person they needed in the job, not somebody who didn't know anything about it, couldn't even type. Also, you're making valid points. He doesn't seem to be the best fit for this job. But what we're looking for is whether the city did what it was required to do. And it seems to me maybe it legitimately. Somebody who's not at all used to office work is not going to have the right attitude, the right personality, the right whatever else. But it seems to me that under the ADA, he's got to give it a good old try. And almost said college try, but that's one of the issues here, not one of the situations here. And he didn't do that, is at least what the evidence suggests, did not go to training. Is there some, I mean, I'm sympathetic, but is there some rule in case law, regulation or otherwise that says that would exempt him from trying, would exempt him from going to training because this is such an unorthodox placement for him? I don't think that there's any requirement in the ADA either way. I don't think that. How do you make this fit analytically? I mean, it's an odd choice for the city, but they're going to say there weren't many choices, at least in this particular department. So how do you make this fit with the case law, the regulation that he actually was entitled to continue to be accommodated even though he didn't try very hard at this first job? I think the way that that line is drawn is, first of all, there's nobody, not Mr. Dillard, nor his supervisor, Ms. Dickens, who thought that the accommodation was appropriate in the first place. But he did say he would give it a try. But once he sat in the desk and was ready to try the job, Ms. Dickens didn't give him any work to do. And her testimony is very clear that she didn't think he was an appropriate candidate from the get-go. And once she didn't give him any work to do, and he testifies, it's in the briefs, I was supposed to be answering the phones and filling out forms that the inspectors gave to me. He wasn't given any of that work to do. All he was given was a stack of typing. How soon was he given the obligation to go to training and he didn't go? I think that was several months into the position, once everybody had already said this is not working out. And so what the city had available to it was positions for which somebody with his qualifications was qualified. I mean, here's one way that you can tell that this position was not appropriate for Mr. Dillard. He did not meet the minimum qualifications for that administrative assistant position. This is something that the judge and the city both hit hard as to why he shouldn't be allowed to be considered for any of these other positions that we identified was he wasn't qualified for those jobs. Yet they're willing as an accommodation to put him in a job that he did not, that job says you have to have three years of administrative assistant experience to even start in it. He didn't have any years of administrative assistant experience and he didn't have any years of administrative assistant experience. So I think the best one is this court's decision in the, I've had the worst time trying to pronounce this case, it's Lilseged, 178 F3rd 731. And it says that an employee continues working on capacity needing an accommodation while the interactive process is ongoing, which is what happened here. He continued doing the secretary job while they were supposed to be doing the interactive process with him. And then Lilseged says an employer that dragged its feet in that situation could force the employee to work under suboptimal conditions, simply document the employee's failures and use the employee's difficulties as an excuse to terminate her. So what Mr. Dillard did was as soon as it became obvious that he couldn't do the job, he said can't you guys give me an alternate assignment, something like a security guard or an inspector that I'm more qualified to do. And the city had a program, the ADA reasonable accommodation return to work program that says they're supposed to have Mr. Dillard sit down with a return to work coordinator and the city's doctor and the city's doctor is supposed to talk to his doctor and the return to work coordinator is supposed to talk to him and they're supposed to look at all of the vacancies throughout the city. There was a job vacancy at the time as a shuttle driver and the minimum qualifications for that job was a year of driving experience. Derrick Dillard drove dump trucks and chip spreaders and street sweepers and everything and they're saying in this case we couldn't consider him for that job even though all it is is driving people from a music festival to their cars. Our case law has repeatedly said you don't get your preferred accommodation. And it just seems stepping back from these multi-factor inquiries we have, the question at the end of the day is was there discrimination against him based on defendant not trying to accommodate his situation and they give him more leave than the FMLA requires because of his disability, then they bring him back. To me the fact they put him in a job that might not have been a perfect fit, isn't that evidence that they're actually trying to do whatever they can even though it's not great for them to have him in this job for which he needs to be accommodated? I'm not necessarily saying that they were mistreating him but what I'm saying is that they weren't following the requirements of the ADA. The ADA says that when you request an accommodation the employer is supposed to engage in that interactive process with you and see what jobs might be appropriate for you and the city has that program in place. Let me ask you, were they not engaged in it? Did he never have a meeting? I thought there are a fair number of meetings here. What the city is arguing basically, we didn't have anything that he could do and so maybe among all these bad choices here's where we put him and he wouldn't fit in these other jobs either so the interactive process would not lead him to being one of the other positions that he wanted to choose from. So just tell me about that, did he have meetings with whoever the right people were on the interactive process? No he didn't. What the department did, and he worked for the public works department, the public works department said we're going to let you try this administrative assistant job and then once it became apparent that that job was not an appropriate accommodation for him because he didn't meet the qualifications for it and he couldn't do it, they were supposed to under their own policies and procedures, they were supposed to re-evaluate his request for return to work program where he could have been considered for citywide vacancies including that shuttle driver position. Is that clear? I thought after, I'm not sure what first day is, but I thought after 90 days he was no longer eligible for citywide determination, next 90 is in the department, what's that all about? That was a program that they put him in as an injured worker during the time when he was unable to work at all. So there's two separate tracks and the program that says we'll look at you for citywide vacancies, but then there's a whole separate program for ADA accommodations that gives you a whole different level of consideration, possibly allows you to do jobs that you wouldn't otherwise have been be considered for through the injured worker program and they just never utilized that citywide ADA accommodation return to work program. It's possible and one of the witnesses testified well he never requested an accommodation under the ADA and there's fifth circuit case law going back very far that says you don't have to use the magic words of I need a reasonable accommodation. All you have to do is put the employer on notice that this accommodation is not effective. Once he did that they did nothing but drag their feet, require that supervisor to document all of his supposed performance problems and then fire him not even because of the performance problems as the district court found but because he wasn't able to do the essential functions of his maintenance worker job that he did originally. So they left him in this job for six months during which they easily could have placed him in that ADA reasonable accommodation return to work 90-day program, looked at various citywide positions for him including shuttle driver. If he couldn't have done those jobs he gets a 90-day probationary period in those jobs to determine whether he can do it or not. If he can't do it they're supposed to re-evaluate him for another job. If you're not qualified you're not accepting that but if when the district judge actually looked at the other jobs and said he was not qualified for them the fact he wasn't qualified the one for he was given doesn't necessarily mean he gets the reasonable accommodation is to shift him to another job that he's not qualified for. Do you agree that the district judge did actually look at these other positions and say he was not qualified for them? He did say that but he did not look at all those positions and I'll be glad to discuss that in my five-minute rebuttal period. The city will probably address that too. May it please the court, your honor. Megan Mosby for the city of Austin, Texas. What we have here is a story about no good deed going unpunished. I think what you'll see by what's clear in the record is that there is no dispute as to what actions the city took when the city took those actions and really why the city took the actions that it took. One of the questions that was just posed was well when did the interactive process really begin and from the city standpoint the answer is very clear. At the time that Mr. Dillard was injured back in March of 2011, shortly about a month after that the city enrolled in what's called our return to work program and you heard plaintiff's counsel talk about that program a little bit but let me give you a little bit more of an explanation as to how that works. You're absolutely right, your honor, that the employee first goes to the department-wide placement. If there are no available positions open in the department then the city is the employee is city-wide. He has made the argument in his briefing ending in this morning that there is a difference between the injured worker and the disabled worker. Is there and was he placed, is there an argument and if so respond to it that he was placed in the wrong one? There are two programs, your honor, and this is how the program works. Every employee initially goes through the injured worker program because we don't have any documentation when the employee is first injured that in fact they are, you know, able to or eligible to go through the ADA accommodation one. Mr. Dillard was injured in March of 2011. We never got full release from his doctors until February of 2012. So at this point in time we're talking about well beyond the 180 days that either one of the program really contemplates. But we would argue that that really was our first step at the interactive process. Mr. Dillard technically. It's not some interactive. It seems to me under the regulations you're required to keep up with him and know what his condition is. Is that not considered part of the interactive process to see or do you have to have accommodated him before there's a, of actually putting him in another job before in your view the interactive process begins? Sure, your honor. Well, that's just it. During that return to work program, that 180-day period, there is an interactive process that's going on. We have a coordinator. We also have departmental representatives that Mr. Dillard would have been meeting with or at least corresponding with during that time. The problem that Mr. Dillard had was that he was not released to any duty at all whatsoever during that point. So we were kept abreast of his medical situation, but without him being released to any duty at all, the city had no options in terms of placing him. Nevertheless, once those 180 days expire, the department has an obligation to then reassess what is the next course of action. Plaintiff has stated in his own brief the city could have fired him then, but the city chose not to do so because... Why could the city have fired him then? Well, at that point in time, his FMLA had expired. He was out of leave. He still could not perform the responsibilities and the duties of his original assignment, and he doesn't contest that he would have been able to do that. So legally, the city had the right to terminate his employment at that point, but we chose not to do so, and we chose to yet continue the interactive process. And so we gave him leave well beyond what he was entitled to, and then it was not until April of 2012 that he was first released back to duty. At that point in time, the city looked within its department in the Public Works Department because our policy at that point doesn't give us any obligation to look citywide, so we looked within the Public Works Department. Mr. Dillard had... If, in fact, you are now under the ADA, even though somewhat voluntarily is what you seem to be trying to tell us, it seems to me that you may not have the right to limit it to the department unless you can show some hardship in having the full citywide employment positions being considered. Do you agree with that? Your Honor, I would disagree with that, actually. I think the Emmerich v. Libby case talks about the employer's responsibility, and that's an Eastern District of Texas case, but it talks about the fact that the employer is not obligated... This was in court, by the way. Judge Costa used to be on it. And it talks about, Your Honor, that the employer is not obligated to deviate from its regular practices in that case when you're looking at accommodations. This was not a situation where we were looking to give Mr. Dillard any type of preferential treatment than what we would any other employee. The ADA law is very clear. It's looking at equality. It's not looking at We stood to our practice of, at that point, looking department-wide, and it was very noticeable, or notable, rather, because Mr. Dillard had expressed interest in the division in which he was ultimately placed. Albeit, I think it's clear that the city supervisor thought it may not have been the greatest fit. Mr. Dillard, apparently, at some time shortly after, thought that it may not have been the best fit. But it was actually the area where he wanted to end up being. He wanted to go to that area. And so, by the city engaging in that interactive process, we said, let's give it a try and see if this will work. Now, one of the questions that Your Honors asked earlier was, well, how long after he was placed in that position did we notice that there was a problem? And how long after was there any request by the city to have him to go these trainings? You will find in the record, Your Honor, that Mr. Dillard started that reassignment position in May of 2012, May the 2nd, I believe. As early as May 17th, the city supervisor sent Mr. Dillard an email stating, this is the link to the keyboard classes that you want to take. Less than a month after that, he was required to attend an Excel class. And there were other cases where he simply chose to put no effort towards to actually pursue. It would be possible. This is an unusual. The facts of this case may have made it hard for the city, which is probably your position to do much else. But this is an unusual place to be putting someone like Mr. Dillard, with all respect to him and all the good work he's probably done for the city and his years of working for him. And are you saying that ADA law, at what stage does the city and its continuing obligation to engage in the interactive process, at what stage does the city have to acknowledge or what has to occur before the city has to acknowledge that this is not a good fit? This man has spent his life doing other sorts of things. He's not an office worker. He's not a typist. Yes, he can take training, but this is not the kind of guy who's going to become a has to accept that? And are you saying that didn't happen here? Or do I have the wrong understanding of the law? Does the city not have to accept that he's just a terrible fit to become an office worker? I think, Your Honor, addressing your question, I think what's different in what the case law that has been presented in the briefs are those were examples of plaintiffs who were not a good fit because their disability hindered their abilities to actually successfully perform the job. As long as it's not his disability, so long as it's not bad back and shoulder, whatever it was, if he goes through the training, seems to put more efforts, forgets the internet surfing or whatever he was doing, and he still doesn't make it as an office worker, what then? You don't have bad attitude if that's an unfair characterization from Dillard's I apologize, but whatever it is, lack of effort. If you don't have that, and they gave the effort, and he still can't do it, what's your obligation? So here was our obligation, Your Honor, from the city's standpoint. At the time that he was placed on the job, we realized shortly thereafter that it was not going to be a good fit. However, in any reassignment position that the city places, you have a three-month probationary period. In this instance, we gave Mr. Dillard five months. We gave him extended time. Five months or a week? Five months. But doesn't that get you into the case law that says you can't just put somebody in a position that he can't work in and just keep a record of all the bad things he does and fire him on that basis, which ultimately was the justification in part used by the district judge. And we didn't do that, Your Honor. The city did not do that in this case. This is what the city did. The city gave him an extended period of time because they wanted to give Mr. Dillard the opportunity to take the classes, to show the initiative, to show the willingness to learn the job. Mr. Dillard was a former field worker. He did more of the hands-on paving, paving the streets and things of those natures. He could no longer do that because of his physical disability. Now, again, we get back to the case law where he's not entitled to the job of his choice. So we gave him a position, the administrative position, that was more in line with the medical restrictions that he could actually accomplish in the area where he wanted to be. We gave him those opportunities. He's not like the plaintiffs in the case law that the plaintiff cites in their brief where they were set up to fail because they couldn't perform the jobs that were given to them because their disabilities prevented them from doing so. Mr. Dillard is basically his lack of desire to show initiative, his lack of willingness to learn the job. One way to look at it, and in fairness it's not completely inappropriate, but it's another way to look at it is you're trying to turn somebody into something he's not after a fairly long employment history. Is there any evidence that during this period that he was working or not working as an administrative assistant that he was considered for the jobs that are being talked about in the briefing and that there was an actual recorded evidence-supported decision by the city during this period, not after the fact, that he wasn't qualified? Your Honor, what the city did do, they did look, the city looked internally within Public Works to see if there were other assignments within Public Works that may have been a better fit for Mr. Dillard. There were no other availabilities within Public Works during the time frame of May 2012 through October 2012. The city did not look citywide at that point because that was not our regular protocol to do so. But there were other vacancies during that time period, I would assume, just a big... Yes. So there were other vacancies in the Department of Public Works during that time period insofar as the evidence doesn't maybe say one way or the other or does it say there were vacancies? There were no other vacancies within Public Works during the time period of May 2012 through October 2012. No other vacancies or just no others that the city thought he was qualified for? No other vacancies, Your Honor, within Public Works. There were other vacancies citywide, but again, that takes us into the city deviating from its normal practice of no vacancies. What is the evidence about? You mentioned earlier that he was offered a... sent an email some two weeks or so after he started with a link to some keyboard training he could do. What is the evidence in terms of what training was offered? Did he go to some of it? None of it? What's the evidence on that? Your Honor, the email that was sent was a link to a typing or proficiency type of class that he could have taken. That was the email that you'll find in the record at 645 in the record. It talks about the different classes that were offered. The city, on a constant basis, we have something called the Communications and Technology Management Department, and what they do is every so often, usually several times a month, there are classes that are offered that an employee can take to boast their skills in Excel and Word, and so there were several classes that were available, and again, you'll see those classes located within the record that Mr. Dillard could have taken if he showed, if he cared to show any initiative to do so. We really think, Your Honor, it's the city's position that part of the reason, the main reason of this failure in this breakdown was Mr. Dillard's lack of initiative to want to learn. It wasn't because the city was so happy and eager to terminate him immediately, although we really could have done so a long time ago. The city continued to engage into the interactive process with Mr. Dillard. Even when he was placed in the reassignment position, that job was actually at a in his old assignment. The city then met with Mr. Dillard after the reassignment. Months had gone by. Again, we're talking about a three-month probationary period. We gave him five months to do the job, Your Honor, and then in October, around October 9th of 2012, the city had a pre-termination status hearing of sorts where the city supervisors as well as Mr. Dillard and the union rep met to that were being displayed while he was performing that reassignment job and also just to gauge what were his thoughts about his ability to continue his employment with the city. Is there evidence of what work he wasn't doing that he was given? Yes, Your Honor. As a matter of fact, the supervisor that Plaintiff's Council has referred to, Ms. Dickens, part of her frustration with giving Mr. Dillard work was that when she tried to give him one assignment in particular, and I don't think that the testimony is conclusive that that was the only thing that he was given, but she gave him a relatively simple assignment to complete that should have taken a day, maybe a day and a half. Mr. Dillard took over a week to do it. You had his fellow colleagues, even if we want to exclude the supervisor, his fellow colleagues are reporting him saying he's asleep again. Mr. Dillard doesn't contest that he was there. They're talking about him listening to him, talking on the phone with his Bluetooth. He's playing games. And at some point, there's a lack of confidence in the employer to give him anything that's going to be meaningful because there's no faith necessarily that he may or may not be able to do it. But the city wanted to give him the opportunity to try. And that's why it extended that leave time and extended those conversations and even continued to look within public works for another fit, but there simply was no other fit. So even if we go back to the five months that have now passed and we get to October where we have the status meeting, yet again, we're back to yet no good goes unpunished, the city still doesn't terminate, Mr. Dillard, because it takes more time to kind of reevaluate once again, is there another fit? But there weren't any other fits in public works. Mr. Dillard then went back on no duty status on October 23rd of 2012. It was not until, it was not until October 26th that at that point in time that the city finally made the decision to terminate Mr. Dillard after all other options have been exhausted. And so when you ask the question of how much is enough with the interactive process, the city believes that it did everything within its power to give Mr. Dillard the ability to succeed. It did not ultimately work, but he had those opportunities that were available to him. And we started that interactive process from the very beginning. And I want to ask you something about the evidence in this case. If I perceive your responsibilities as once the interactive process goes, begins, that you need to work with him as he needs to work as well. If it is determined in a fairly brief period of time or a longer period of time that he is not working out in this particular situation, lack of the basic skills, lack of the proper aptitude, maybe lack of proper attitude, I'm not sure about that, but I do say this is an unusual place to put him, that you have an obligation to find someplace else within the city employment that's available and that does fit his skills. Now it's clear, it seems to me, that he was not qualified for this position. He didn't have the basic computer skills that you would need and whatever else. So after a month, after two months, it doesn't seem to me as if there was any effort on the part of the city to find something else for him. So just tell me as a matter of fact, is that true, that there was not any other position either within Department of Public Works, you're saying there were none at all available for anybody, no matter what their aptitude, or elsewhere in the city that he could have been tried at? Your Honor, I think the record is very clear. There were no other positions within Public Works, given his medical restrictions, that he would have been able to do during that period of time that's in contest. Okay, so you're giving me a slightly different answer than I heard before, but you probably didn't, I didn't hear you right or you didn't understand my question. So you're telling me there were vacancies in the Department of Public Works, but the city decided he wasn't qualified for them? Or, and it may not be solely a qualification issue, Your Honor, as it was a given his medical restrictions. I'm including that, but you don't know that I was including it. But anyway, so that's what I meant. So big city vacancies come up frequently, but insofar as during this five or six month period, none of those vacancies would have fit him, you're telling me? Correct, Your Honor. And there was no effort, maybe because there's no obligation, but there's no effort to look outside the Department of Public Works on the part of the city. At that point in time, no, Your Honor, from the time of May 2012 through October 2012, it is the city's practice to only look departmental at that point in time. If we wanted to, although it is the city's position that we don't even get to the point of whether or not he was qualified for those other positions citywide, I think the evidence in the record is very clear that he wasn't qualified for those positions that he may have preferred to also. In most of those, they lacked either years of experience that he didn't have, they lacked perhaps certifications that he did not have. And so we don't believe that he even was qualified for those positions. He wasn't qualified for the administrative assistant position either on that basis, was he? Correct. But at that point, again, it was an area that Mr. Dillard wanted to go into, and so we gave him the opportunity to actually try that area out. My time is up, Your Honor. What about the driver position that Plaintiff's Counsel mentioned? The driver's position was not within the Department of Public Works. That was a citywide position, so it was simply something that was not considered at that time. Thank you, Counsel. Thank you, Your Honors, for your time. I guess maybe I should talk about first what the city's obligations are, and then we can get to the question of what positions he was actually qualified for. The city contends that it didn't have an obligation to look outside of Public Works because that was not part of its policies. I think this argument in the District Court that they had to look outside of Department of Public Works? Yes. Yes, this was argued to Judge Lane. The Eastern District of Texas case that the city refers to, it does hold that the city is not required to look in a way that its policies and procedures don't provide for to see if there are available positions. There are two key pieces of evidence that show that the city's policies and procedures do provide for transfers among departments or between departments. The first one is that... Let me ask you this as far as the argument. Did you ever make the argument that it just doesn't fit under ADA case law for Austin to do it that way, that Austin must show it would be an undue burden to go outside of the department or some other basis? Did you make that argument? It didn't really come up in those terms. Okay, so it was more of a factual argument that you were making with the city? Well, we showed that they had an obligation to engage in the interactive process with him, and that the statute says they've got to consider him for transfers to available positions. Then, I guess, one layer down from that is what available positions do they actually have to consider him for? And that was a fact-based argument that was made to the district court. The first... That last part, you got too soft on me there. I'm sorry? Say that last part again. Okay, that sort of second layer down of what positions, what vacancies did they actually have to consider him for? That was a more fact-based argument to the district court. And there's two primary pieces of evidence that show that the city has a regular practice of transferring employees between departments. The first one of those is at page 513 of the record, and it's the transfer policy for the city. The transfer policy says that to provide maximum opportunity for advancement to all employees and to promote optimum staffing, it is the policy of the city to encourage the transfer of employees between city departments. So the city has a policy and practice that says, we love for city employees to transfer between departments. That's what the whole city-wide ADA accommodation return to work program is meant to do. And that's the second key piece of evidence that shows the city has a practice. It has an outside of their departments when they need a reasonable accommodation, and there's not a department job that's effective as an accommodation. So that program says, first we look inside the department. If we don't find you something inside the department, we look outside of the department to see what jobs are available. They never did that with him. And so what the district court found when we said, he's qualified for all these jobs outside of his department. The district court said that the district court didn't address each of those jobs specifically. The only finding the district court really made about what jobs he was qualified for were to say that the city has pointed out that the essential functions of several vacant positions required additional attributes such as specialized licensing or prior experience in a relevant field. The jobs that we listed in our briefs to this court don't require any specialized licensing. The district court did not address those at all. Mr. Dillard met the minimum qualifications for each of those positions. There's no dispute about that. The city doesn't dispute it. Judge Lane didn't make a finding on it. And this court's very clear precedent. All it says is that if the employee meets the minimum qualifications for the position, then the employee has made out a prima facie case that they are qualified for that job. That is Pratt v. City of Houston, 247 F. 3rd, 601. Counsel? Yes. Let's assume that your argument is correct, that they would have still had to look at a position outside the department. I guess one of the questions though would be, at what point does that obligation arise given the facts we have here? If they've put him in the administrative position and the evidence, at least as the city characterizes it, seems to be that he wasn't making an effort to take advantage of training and learn the position, what's the city supposed to do? Go ahead and say, okay, we give up, you get to pick? Or do they wait to see if he can train up and learn the position? And if the rule is that as soon as he basically says, no, I'm not going to go to the training or he doesn't go to the training, they have to start looking for something outside the department, isn't that the functional equivalent of letting him pick his own job? I think it's not. I think it arises when both Mr. Dillard and his supervisor said, this job is not working out. She said... I guess my question is, why was it not working out? Was it because he wasn't going to the training? Well, if you look at the city's brief at page nine, they say all the different training classes that he went to. He was given three hours of one-on-one training in Microsoft Word, sent to an Excel class. He spent two or three days training and shadowing with his counterpoint from another office. So this whole idea that he didn't try, it's wrong. The supervisor didn't want him there from the get-go, and he didn't want to be there either. There was nothing about the accommodation that was reasonable from the first place, but he did try. He went to those trainings, and he just couldn't be a secretary. It wasn't his job. All right, Kels. Thank you both. Thank you.